UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEPHANIE NICHOLS,

       **Plaintiff,**

   v.                          Case No.: 2:14-cv-2796
                                    JUDGE SMITH
                                    Magistrate Judge Vascura

**OHIOHEALTH CORP.**, *et al.*,

       **Defendants.**

## OPINION AND ORDER

This matter is before the Court upon the Motion for Summary Judgment of Defendants OhioHealth Corporation, Kay Holland, Kathy Talbott, Nancy Miller, and Charissa Cattrell (collectively "Defendants") (Doc. 31). Plaintiff opposed Defendants' Motion (Doc. 50) and Defendants replied in support (Doc. 56). This matter is now ripe for review. For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED**.

### I. BACKGROUND

This case concerns Plaintiff's attempt to obtain a Senior Radiology Technologist position with OhioHealth Corp. ("Ohio Health") at the Riverside Breast Health Center. (Doc. 2, Compl. at ¶¶ 6, 12). Although Ohio Health originally offered Plaintiff the job, Plaintiff's offer was rescinded before she ever began working for Ohio Health and this lawsuit followed.

Plaintiff applied for the Senior Radiology Technologist position on July 26, 2012. (Doc. 3, Am. Compl. at ¶ 11). Plaintiff had worked in similar positions performing mammograms for over thirty years before she applied for the position with Ohio Health. (Doc. 48-1, Pl.'s Application at PAGEID# 742–43). While waiting to hear about her application, Plaintiff

contacted a former coworker, Dee Goodwin, who worked for Ohio Health at the time. (Doc. 54-1, Nichols Dep. at 26). Goodwin spoke to her supervisor, Katie Roth, about Plaintiff and Plaintiff forwarded her application directly to Roth. (*Id.* at 26–27). Roth informed Plaintiff that Goodwin had wonderful things to say about Plaintiff. (*Id.*). Plaintiff interviewed with Roth shortly after her email conversation. (*Id.* at 28–30). After her interview, Plaintiff had a short meeting with Liz Tully, an Ohio Health human resources representative. (*Id.* at 30–31). Following her meeting with Tully, Plaintiff had a telephone interview with the head of mammography. (*Id.* at 33–34). Shortly after Plaintiff's phone interview, Kathy Talbott, a recruitment consultant, called Plaintiff and offered her the job. (*Id.* at 34). Talbott informed Plaintiff that the position was contingent on a background check and a health assessment and said that she would be mailing Plaintiff information memorializing the call. (*Id.* at 34–37). Talbott sent Plaintiff an offer letter dated August 21, 2012, again indicating that the job offer was contingent on the completion of a background check and a health assessment. (Doc. 48-4, Offer Letter). The Offer Letter scheduled Plaintiff for Ohio Health orientation on August 27, 2012. (*Id.*).

Prior to completing the Health Assessment, Plaintiff filled out a few different documents about her health history. Under the section asking "Do you have any limitations that would keep you from performing the duties of your job?", Plaintiff answered, "Cannot stoop or work standing on my knees." (Doc. 54-3, Health History). Plaintiff's noted limitations were the result of a meniscus tear that had been surgically repaired a year prior to the Health Assessment. (Doc. 54-1, Nichols Dep. at 50). Plaintiff did not mark either the "No" or "Yes, if yes explain" check boxes next to the question. (Doc. 54-3, Health History). Plaintiff stated that she did not check either box because she did not believe the knee issues kept her from performing her job. (Doc.

2

54-1, Nichols Dep. at 55–56). Plaintiff noted that she has poor balance and that if she needs to go down to the floor that she usually "hang[s] on to something." (*Id.*). The next question on the form asked "Are there any accommodations that you need our company to make to perform this job?" (Doc. 54-3, Health History). Plaintiff checked the "No" box. (*Id.*).

Plaintiff's in-person health assessment took place at the Riverside Hospital campus with nurse Charissa Cattrell. (Doc. 54-1, Nichols Dep. at 41–42). Cattrell and Plaintiff discussed Plaintiff's noted knee limitations. (*Id.* at 50). Cattrell told Plaintiff that she did not like the way Plaintiff had worded her limitations and rewrote it to say that Plaintiff could not kneel because of knee pain and that Plaintiff could not stoop without holding onto something. (*Id.* at 56; Doc. 54-3, Health History). Plaintiff admits that her description of her limitations was "kind of vague" so she tried to explain to Cattrell "the real issue." (Doc. 54-1, Nichols Dep. at 57). Plaintiff believed "'Stooping' means kind of a squat to the floor. 'Standing on my knees' was when I'm in an upright position on my knees. And 'kneeling' to me means you have—you're squatted with one foot on the ground and one knee on the ground." (*Id.* at 60). Plaintiff indicated that stooping did not cause her knee pain at that time but that standing on her knees and kneeling did cause knee pain. (*Id.* at 60–61). Plaintiff told Cattrell that she could perform all of her duties but that "it's a little bit more painful," because of the knee surgery. (*Id.*). Cattrell informed Plaintiff that she would have to send Plaintiff's information to another department. (*Id.*).

After the Health Assessment, Cattrell emailed Nancy Miller, an accommodations specialist, stating "New hire Sr Rad tech at RMH mammo/Nao 0827/2012/indicated on her health hx form that she cannot stoop without holding onto something or kneel because of bilateral knee pain. States she had surgery on her Rt knee 1 year ago for a 'tear.'" (Doc. 47-9, Cattrell 8/22/12 Email to Miller). Plaintiff next spoke with Miller a day or two after Plaintiff's

Health Assessment. (Doc. 54-1, Nichols Dep. at 73). Miller began discussing Plaintiff's limitations and Plaintiff responded "I can do these things." (*Id.* at 74). At that point, Miller allegedly called Plaintiff a liar for writing the things down in the Health History and refused to let Plaintiff explain. (*Id.*). Plaintiff did not request any accommodations during the call but did not get a chance to explain her vague wording. (*Id.* at 74–77). Plaintiff stated that she did not ask for accommodations during that phone call because she does not need accommodations and that the phone call ended after about ten minutes. (*Id.*). Miller told Plaintiff that she would have to report the issue to Kay Holland. (*Id.*). Miller had a different memory of the phone call, stating that Plaintiff "indicated that the restrictions could be accommodated by potentially leaving the door to the mammography suite open or having another person to be available to assist her." (Doc. 46-2, Miller Dep. at 37). Miller suggested that in "some places it might be possible to install grab bars, which would have been of assistance potentially to her getting up from a kneeling position if needed." (*Id.* at 43). Plaintiff responded that she would check into that. (*Id.*). Miller stated that she did not accuse Plaintiff of lying or backpedaling. (*Id.* at 45–46). Miller told Plaintiff that she would discuss the requested accommodations with Plaintiff's new manager. (*Id.*).

Miller next spoke to Kay Holland, the manager of Radiology to discuss the accommodations Plaintiff requested. (*Id.* at 56). Holland stated that to leave the door open would violate radiology and HIPAA protocols and that the staffing system could not allow two people in an exam room at one time. (*Id.* at 57). Holland also said that grab bars were not possible because of the size and orientation of the room. (*Id.* at 58).

Plaintiff and Miller spoke the next day when Miller told Plaintiff to get documents from her doctor stating that she had no limitations and to fax that information to Miller by the end of

the day. (Doc. 54-1, Nichols Dep. at 77–80). Although Plaintiff told Miller that it was unlikely that she could get the requested records by the close of business on a Friday, Miller insisted "'[i]f you do not get me these documents by the end of the day, you cannot attend orientation on Monday.'" (*Id.* at 78). Plaintiff stated that she and Miller did not discuss accommodations "because we weren't at that point in this process. I was just trying to give her the documents to say that I had no limitations, of which I was quite aware I didn't have limitations." (*Id.* at 79). Plaintiff offered to come to Ohio Health and demonstrate that she could perform the job but Miller informed her that it was too late in the day to do that. Again, Miller has a different memory of the call, stating that Plaintiff offered a doctor's release to full duty upon hearing that her suggested accommodations could not be met. (Doc. 46-2, Miller Dep. at 61–64). Miller insists that the door was not closed on further possible accommodations. (*Id.*). The call ended with Miller waiting on a fax from Plaintiff's doctor. (Doc. 54-1, Nichols Dep. at 80).

After the second conversation between Miller and Plaintiff, Plaintiff contacted Kimberly Cox to see if Cox could talk to Holland about Plaintiff and put in a good word. (Doc. 54-1, Nichols Dep. at 86–87). Cox was a friend of Plaintiff's in the imaging department at Ohio Health. (*Id*). Miller called Plaintiff and said "[h]ow dare you call and try to get someone within the system to vouch for you. I'm your representative and you are to let me do that for you . . . From now on, if you need -- if you need questions or you need communication done within the system, you call me." (*Id.* at 88).

On the Monday when Plaintiff was originally scheduled to have orientation, Plaintiff called Talbott to see if she could attend orientation on Tuesday but Talbott informed Plaintiff that orientation was a two day process and that Plaintiff would have to wait for the next orientation. (Doc. 54-1, Nichols Dep. at 94–95). Plaintiff's doctor, Dr. Barker, faxed a note to

5

Ohio Health, stating: "Patient was last seen 9/7/11. The patient was released without restrictions at that appointment." (Doc. 54-4, Barker Fax at 2). Barker's fax also included a September 8, 2011 note, stating Plaintiff was cleared for "Return to Work 9/12/11 without restrictions." (*Id.* at 3). Dr. Barker also provided a note from Plaintiff's September 7, 2011 appointment which stated, "[Plaintiff] has not required physical therapy at this point in time but certainly she will give us a phone call if she stalls with progress and perceives the need for some reconditioning, which would be nicely accomplished by therapy if necessary." (*Id.* at 4). Plaintiff never sought physical therapy for her knee and did not see Dr. Barker or any other care provider for her knee between her release to work and Barker's fax on August 28, 2012. (Doc. 54-1, Nichols Dep. at 82–83).

On Tuesday, August 28, Plaintiff emailed Roth to inform her that all of the necessary medical documentation was sent to Ohio Health and that she would be ready for the next orientation. (Doc. 48-10, Pl. 8/28/12 E-mail to Roth). On September 4, 2012, Talbott informed Plaintiff that the offer was rescinded and that the position would not be filled. (Doc. 54-1, Nichols Dep. at 97). Plaintiff asked if that was the case even though she had submitted all of the required medical documents and Talbott confirmed that the offer was rescinded. (*Id.*).

Plaintiff filed an EEOC charge in November of 2012 and received a right-to-sue letter in October, 2014. (Doc. 48-12, EEOC Charge; Doc. 3-1, Right-to-Sue Letter). Plaintiff filed suit in this case on December 31, 2014. Plaintiff brings the following claims against Defendants: (1) Ohio Health rescinded its offer to Plaintiff "because of her disability and/or perceived disability" in violation of the Americans with Disabilities Act as Amended ("ADAAA") and Ohio Revised Code § 4112.02(A); (2) Ohio Health conducted an unlawful medical examination and/or unlawfully used the results of Plaintiff's medical examination . . ." in violation of 42

U.S.C. § 12112(d) and Ohio Revised Code § 4112.02(A); (3) Ohio Health failed to provide an accommodation for Plaintiff in violation of 42 U.S.C. § 12112(b)(5) and Ohio Rev. Code § 4112.02(A); and (4) Holland, Talbott, Miller, and Cattrell "aided and abetted in discrimination" against Plaintiff in violation of Ohio Revised Code § 4112.02(J). (Doc. 50, Mem. Opp. at 1–2; *see also* Doc. 3, Am. Compl. at ¶¶ 38–68).

## II. STANDARD OF REVIEW

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant

must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

### III. DISCUSSION

Defendants moved for summary judgment on all of Plaintiff's claims providing legal and factual arguments against each. Plaintiff responded to each of Defendants' arguments and the Court will address each in turn. Before turning to the merits of each claim, the Court **GRANTS** summary judgment in favor of Defendant Talbott as Plaintiff made no arguments for liability against Talbott.[1]

**A. Disability Discrimination**

Plaintiff's first cause of action claims Ohio Health rescinded her offer because she was disabled and/or because Ohio Health believed her to be disabled in violation of the ADAAA and Ohio Revised Code § 4112.02(A). Ohio Health argues that Plaintiff does not suffer from a disability, that Ohio Health did not perceive her as disabled and that even if Plaintiff succeeds in overcoming the earlier defenses, that Ohio Health's decision maker had no knowledge of the alleged disability.

As an initial matter, "because Ohio case law tends to suggest that it entails the same legal analysis as that under the ADA, [the Court] will analyze plaintiff's state and federal discrimination claims under Ohio Revised Code § 4112 and the ADA, respectively, solely under the ADA." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004) (citing

---

[1] Although Plaintiff attempted to dismiss the claims against Talbott, under Rule 41 of the Federal Rules of Civil Procedure, once responsive pleadings to a complaint have been served, a plaintiff may not dismiss a party without a stipulation of dismissal signed by all parties who have appeared or by court order at a plaintiff's request.

*Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938–39 (6th Cir. 2000)); *see also Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (citing *City of Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (1998)).

The prima facie case for a discrimination claim under the ADAAA where the Plaintiff presents no evidence of direct discrimination is: (1) the plaintiff is disabled; (2) the plaintiff is otherwise qualified for the position, with or without reasonable accommodation; (3) the plaintiff "suffered an adverse employment decision;" (4) "the employer knew or had reason to know of the plaintiff's disability;" and (5) "the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

Ohio Health argues that Plaintiff cannot meet the prima facie for disability discrimination because she was not actually disabled. Under the ADAAA:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Plaintiff argues that she has provided sufficient evidence to show that she meets the definition of disability because she is both substantially limited in a major life activity by her impairments and that she was regarded as having such an impairment. The Court will address each below.

### 1. Plaintiff was not Substantially Limited in a Major Life Activity

Defendants argue that Plaintiff is not disabled under 42 U.S.C. § 12102(1)(A) for three reasons: (1) she testified that she was not disabled; (2) her physician released her to full duty prior to her offer being rescinded; and (3) Plaintiff has not identified how any of the alleged conditions actually "substantially limit[] her from one or more major life activities." (Doc. 56, Reply at 3 (citations omitted)).

The Court first addresses Plaintiff's deposition testimony in which she twice stated that she did not believe was not disabled. (*See* Doc. 54-1, Nichols Dep. at 103, 114). In the first instance, Plaintiff's answer was in response to a question about why she offered to go to Ohio Health and show her abilities; she stated:

> To go back over, to drive down -- up to Columbus, to go back over to Employee Health, because I assumed that would be the place that you would show a nurse or somebody my ability . . . I'm not disabled . . . I have pain sometimes on my knees; and that I can do all of the things that I listed that I couldn't do on a -- on the job, that I can indeed do them but just need, you know, something to hang on to just to get back up.

(*Id.* at 103). In a second instance, Plaintiff had the following exchange with Ohio Health's counsel over objection from Plaintiff's counsel that it called for a legal conclusion:

> Q: I understand you've said that you believe OhioHealth has regarded you as disabled for a number of conditions. Do you, yourself, believe you have a disability?
>
> A. No.

(*Id.* at 114). Plaintiff also stated that at the time of her phone calls with Miller, she did not have limitations imposed by a physician. (*Id.* at 79).

The Court agrees with Plaintiff that Plaintiff's deposition testimony does not conclusively establish that Plaintiff is not disabled. However, that the testimony is not conclusive does not mean that Plaintiff's testimony is irrelevant. *See Haley v. Cmty. Mercy Health Partners*, No.

3:11-CV-232, 2013 WL 322493, at *11 (S.D. Ohio Jan. 28, 2013) (Rice, J.) (holding that the plaintiff's statement that she was not disabled was "not particularly probative of the determination of whether she is disabled under the ADA, which is a legal definition quite distinct from the colloquial meaning of 'disabled.'"); *Young v. Dayton Power & Light Co.*, No. 1:11-CV-119, 2012 WL 1680100, at *7 (S.D. Ohio May 14, 2012) (Black, J.) ("Based on Young's admission that he is not disabled was never disabled, and based on Young's failure to evidence his disability, the Court concludes that Young is not disabled."); *Thompson v. Chase Bankcard Servs., Inc.*, 737 F. Supp. 2d 860, 881 (S.D. Ohio 2010) (Holschuh, J.) (finding a plaintiff not disabled where, among other things, the plaintiff explained that "she has never considered herself to be handicapped and that she has not restricted her job search because of her condition."). In fact, even the case cited by Plaintiff later found that even though plaintiff's testimony that she was not disabled was not dispositive, the plaintiff still failed to show that "she was actually disabled under the ADA." *Wiseman v. Convention Ctr. Auth. of the Metro. Gov't of Nashville and Davidson Cty.*, No. 3:14 C 01911, 2016 WL 54922, at *11–12 (M.D. TN Jan. 5, 2016).

Defendant's next two contentions: (1) that Plaintiff's physician released her to full duty prior to the offer being rescinded; and (2) that Plaintiff has not identified how any of the alleged conditions actually "substantially limit[] her from one or more major life activities" are essentially two attacks at the same issue and will be addressed as a comprehensive review of whether Plaintiff's alleged conditions meet the legal definition for a disability. Plaintiff argues she is disabled under the Act because she suffers from numerous conditions which have been deemed to be disabilities by other courts or by the federal regulations interpreting the ADAAA. Further, Plaintiff claims "that she experienced pain when she kneeled and used 'something to

han[g] on to just to get back up.'" (Doc. 50, Mem. Opp. at 14 (quoting Doc. 54-1, Nichols Dep. at 103)).

Plaintiff cautions the Court that the regulations implementing the ADAAA are intended to be read "broadly in favor of expansive coverage," and the term "'[s]ubstantially limits' is not meant to be a demanding standard." 20 C.F.R. 1630.2(j)(1)(i). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section." *Id.* at § 1630.2(j)(1)(ii). Last, the regulations note that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* Regarding major life activities, the regulations state, "the term 'major' shall not be interpreted strictly to create a demanding standard for disability." 20 C.F.R. 1630.2(i)(2). Included in a list of major life activities are the following relevant activities: walking, standing, sitting, reaching, lifting, bending, and working. *Id.* at § 1630(i)(1)(i). However, "[a]s other district courts have noted, the ADAAA left untouched the plaintiff's burden of proof; he still has to prove he has a disability." *Taylor v. Specialty Rests. Corp.*, No. 2:12-CV-44, 2014 WL 4922942, at *5 (S.D. Ohio Sept. 30, 2014) (Sargus, J.) (internal citations and quotations omitted).

The Court agrees with Plaintiff that Dr. Barker's return to work without restrictions is not dispositive of whether or not she has a disability, but it is a significant blow to her claim that the knee injury substantially limited a major life activity. Plaintiff's memorandum in opposition argues that "[b]ecause Ms. Nichols had degenerative arthritis in her knee, she would continue to experience pain despite the surgery to repair the meniscus tear. Even if Ms. Nichols did not have

degenerative arthritis, it would not be uncommon or unusual for her, or any other individual, to experience limitations after being released by her physician." (Doc. 50, Mem. Opp. at 14). But neither of these points provides any evidence that Plaintiff actually suffered a substantial limitation at the time of Ohio Health's decision to rescind her offer. That Plaintiff "would continue to experience pain" and that it would not be uncommon to have limitations does not mean that she actually had limitations. Plaintiff's memorandum in opposition states that Plaintiff experienced trouble sleeping, pain most all day, and that walking or using stars was not possible. However, each of these symptoms predated Plaintiff's surgery to repair her knee and Ohio Health's decision to rescind her offer.

Plaintiff next points to numerous medical conditions that she alleges qualify as disabilities under the ADAA such as her asthma, high blood pressure, anxiety, severe depression, sleep apnea, acid reflux disease, high cholesterol, high body mass index, and allergies. Although other courts or the regulations do mention some of Plaintiff's afflictions as potentially causing disabilities, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv). Plaintiff's Memorandum in Opposition does not explain how any of the named medical conditions actually affect her life as required by the regulations. Further, although Plaintiff testified that she suffered from depression and anxiety, the regulations identify "major depressive disorder" as a disability, not just any depressive disorder. 29 C.F.R. § 1630.2(j)(3)(iii). Accordingly, Plaintiff has not presented any evidence that her other noted medical conditions had any effect on her major life activities.

Plaintiff's post-surgery limitations identified in the Memorandum in Opposition are that she could not stoop or work standing on her knees because of pain. However, in her deposition,

Plaintiff stated that "'[s]tooping' means kind of a squat to the floor," and then immediately stated that squatting to the floor did not cause her pain at the time Ohio Health rescinded her offer. (Doc. 54-1, Pl.'s Dep. at 60). Plaintiff's description of standing on her knees is "in an upright position on my knees," and that "I just have poor balance . . . if I go down to the floor, I usually hang on to something." (*Id.* at 56, 60). Although Plaintiff's subjective view of her disability is not controlling, her admission that stooping did not cause her pain is highly prejudicial to her claim that her knee injury substantially interfered with her ability to stoop. Further, the Court does not find working while standing on your knees to be a major life activity. In her deposition testimony, Plaintiff also stated that she offered to go to Ohio Health to show "I can do all of the things that I listed that I couldn't do on a -- on the job, that I can indeed do them but just need, you know, something to hang on to just to get back up." (*Id.* at 103). Further, that her doctor released her without restrictions and that she never sought medical help for her knee between the surgery and the events in this lawsuit is evidence that her knee injury did not substantially limit a major life activity. *See Shoemaker v. ConAgra Foods, Inc.*, 219 F. Supp. 3d 719, 733 (E.D. Tenn. 2016) (finding plaintiff not substantially limited where she performed the job and had no working or lifting restrictions). Finally, Plaintiff makes no argument regarding how her alleged limitations compare to the general population as required by 29 C.F.R. § 1630.2(j)(1)(ii). Accordingly, the Court finds that Plaintiff has presented insufficient evidence for a jury to decide that Plaintiff was disabled at the time of the Health Assessment and the rescission of the offer.

### 2. Plaintiff was not Regarded as Disabled

Regardless of the existence of a physical disability, Plaintiff also argues Ohio Health regarded her as disabled when it made the decision to rescind her offer. Plaintiff argues that Ohio Health's referral of Plaintiff to Miller, a workplace accommodation specialist, made clear

that Ohio Health perceived Plaintiff as disabled. Ohio Health argues that Plaintiff was not regarded as disabled because Ohio Health received her return to work without restrictions and that referral to an accommodation specialist alone is insufficient to carry Plaintiff's burden of proof.

Under the ADAAA, a plaintiff will be regarded as disabled "if the individual establishes that he or she has been subjected to an action prohibited under the Act because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The regulations expound on this definition: "Being regarded as having [a disability] . . . means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.'" 29 C.F.R. 1630.2(g)(1)(iii). The "regarded as" test thus has both factual components and a causation component. Factually, a plaintiff must show that employer actually perceived that the plaintiff had a physical or mental impairment and that the employer subjected the plaintiff to a prohibited action. Second, a plaintiff must show that the perceived impairment was the but-for cause of the prohibited action. *Banaszak v. Ten Sixteen Recovery Network*, No. 12-12433, 2013 WL 2623882, at *5 (E.D. Mich. June 11, 2013). The regulations confusingly state:

> Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA.

29 C.F.R. § 1630.2(l)(3). This is confusing because in order to establish that an individual is "regarded as having an impairment," the statute already requires that the person has been subjected to an action prohibited under the ADAAA. It is difficult to imagine many situations in which a covered entity believed a person had an impairment and subjected the person to a

15

prohibited action under the ADAAA, but did not discriminate against the person on the basis of disability under the ADAAA. One possible example is an improper medical examination because "'plaintiffs need not prove that they are qualified individuals with a disability in order to bring claims challenging the scope of medical examinations under the ADA.'" *Taylor v. Health*, 675 F. App'x 676, 678 (9th Cir. 2017) (quoting *Fredenburg v. Contra Costa Cty. Dep't of Health*, 172 F.3d 1176, 1182 (9th Cir. 1999)).

The Court finds that Plaintiff has not presented sufficient evidence to survive summary judgment at this stage for a "regarded as" claim. Plaintiff provides evidence that Ohio Health was aware of her past knee injury from her health assessment, that Cattrell adjusted her health assessment to say that she could not kneel, that Cattrell referred her to an accommodations specialist to see if Plaintiff needed an accommodation, that Plaintiff and Miller had multiple conversations regarding her injuries, and that Miller testified that Plaintiff asked for accommodations. Miller also testified that she told Holland of Plaintiff's alleged suggested accommodations. (Doc. 46-2, Miller Dep. at 56–58).

Although this evidence certainly suggests that Ohio Health knew of a possible impairment, the Court agrees with Defendant that receipt of a doctor's report showing no restrictions has a preclusive effect on a regarded-as claim. See *Gleason v. Food City 654*, No. 3:13-CV-712, 2015 WL 1815686, at *6 (E.D. Tenn. Apr. 22, 2015) ("The fact that Gleason had been cleared to work without restriction by Dr. Brown precludes any finding that Food City 'regarded' Gleason as disabled."); *see also Jennings v. Monroe Cty.*, No. 13-CV-13560, 2014 WL 6675277, at *11 (E.D. Mich. Nov. 25, 2014), *aff'd sub nom. Jennings v. Cty. of Monroe*, 630 F. App'x 547 (6th Cir. 2015) (finding no jury could find that defendant regarded plaintiff as claim disabled where doctors had cleared the plaintiff to return with no restrictions and the

plaintiff had repeatedly asserted he could perform his job). After informing Ohio Health that she had restrictions, Plaintiff informed Cattrell, "I can do all of these things, it's just with the recent surgery to my knee, it's a little bit more painful" and then asked Miller if she could come to Ohio Health to "demonstrate for somebody in authority that I could do all of those things." (Doc. 54-1, Nichols Dep. at 57, 102). Policy considerations also suggest that finding Ohio Health regarded Plaintiff as disabled because Ohio Health referred Plaintiff to Miller would make employers less likely to engage with an employee or potential employee regarding possible restrictions. *See Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 52 (2d Cir. 2012) (quoting *Kramer v. Hickey–Freeman, Inc.*, 142 F.Supp.2d 555, 560 (S.D.N.Y.2001)) ("Moreover, as courts have convincingly observed, accepting [plaintiff]'s argument here would 'discourage employers from taking . . . preliminary or temporary steps . . . for fear that showing concern for an employee's alleged medical problems could draw them into court facing an ADA claim based on a perceived disability.'"). The Court finds that Plaintiff's repeated assertions that she could do the things she originally said she could not do and Ohio Health's receipt of her doctor's note returning her to work with no restrictions forecloses Plaintiff's "regarded as" claim. Plaintiff cannot satisfy the first prong of her disability discrimination claim and therefore summary judgment as to Plaintiff's disability discrimination claims under Ohio and federal law is **GRANTED**.

B.    **Failure to Accommodate and Aiding and Abetting**

Plaintiff's claims for failure to accommodate and aiding and abetting are dependent on the Court's findings regarding her disability. As Plaintiff notes regarding the failure to accommodate claim, "[i]f . . . this Court determines that Ms. Nichols is not disabled, then she is not entitled to an accommodation under a 'perceived as' disability claim." (Doc. 50, Mem. Opp. at 25 (quoting *Wells v. Cincinnati Children's Hos. Med. Ctr.*, 860 F. Supp. 2d 469, 483 (S.D.

17

Ohio 2012) (Beckwith, J.))). The Court agrees that Plaintiff cannot support a failure to accommodate claim because she is not disabled under the ADAAA. Summary judgment as to Plaintiff's failure to accommodate claim is **GRANTED**.

Similarly, Plaintiff's aiding and abetting claims under Ohio Revised Code § 4112.02(J) depend on a finding that Plaintiff was subject to an act that was an unlawful discriminatory practice. Plaintiff explained that the claims against the individual defendants were for aiding and abetting discrimination. She alleged that Cattrell "facilitated discrimination against Ms. Nichols by changing the limitations that Ms. Nichols identified on her Health History form," that Miller "suggested completely unreasonable accommodations" and that Holland made the final decision to rescind the offer. (Doc. 50, Mem. Opp. at 35–36). Because the Court has found that no unlawful discriminatory practice occurred, there is no liability under Ohio Revised Code § 4112.02(J) for Cattrell, Miller, or Holland. Summary judgment as to the aiding and abetting claims is **GRANTED**.

C. **Illegal Health Assessment**

The last claim the Court must address is Plaintiff's contention that the health assessment itself was unlawful under 42 U.S.C. § 12112(d) and Ohio Revised Code § 4112.02(A). Under 42 U.S.C. § 12112(d)(2), an employer cannot conduct a medical examinations before preemployment to determine if a person has a disability or the extent of the disability. However, under 42 U.S.C. § 12112(d)(3), an employer "may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant." If the employer makes the offer conditional upon the results of the medical examination, three requirements are necessary: (1) all entering employees are subject to the examination; (2) the information is treated as a confidential medical record;

and (3) that the information obtained is not used to discriminate on the basis of disability. *Id.* at § 12112(d)(3)(B).

At issue in this case is whether the Health Assessment was performed preemployment or between an offer of employment and the commencement of employment duties. Defendant also argues that this claim was not brought in the Complaint and thus, should not be considered. There is no dispute the health assessment was a medical examination under the ADAAA or that Ohio Health satisfied the ADAAA's requirements for a post-offer medical examination.[2]

The Court agrees with Defendants that Plaintiff failed to plead a claim for an improper medical examination under 42 U.S.C. § 12112(d)(2). The Amended Complaint specifically states that Ohio Health "required Plaintiff to undergo a medical examination after offering her the Senior Radiology Technologist position." (Doc. 3, Am. Compl. at ¶ 44). The Amended Complaint further states that Ohio Health then used the medical examination to discriminate against her on the basis of her alleged disabilities. (*Id.* at ¶¶ 44–46). There is no mention of the health assessment being improper because it was preemployment and the only citation is to 42 U.S.C. § 12112(d)(3)(C), the section discussing post-offer medical examinations. Had Plaintiff made this claim in the Amended Complaint then perhaps Defendant could have prepared a defense "that it could not reasonably have completed the background checks and so notified the appellants before initiating the medical examination process." *Leonel v. Am. Airlines, Inc.*, 400 F.3d 702, 710 (9th Cir. 2005), opinion amended on denial of reh'g, No. 03-15890, 2005 WL 976985 (9th Cir. Apr. 28, 2005). Summary judgment as to Plaintiff's claim under 42 U.S.C. § 1211(d)(3) is **GRANTED**.

---

[2] Plaintiff argues the third criteria—that the information obtained is not used to discriminate on the basis of disability—was not met here, but the Court has already determined that no discrimination under the Act occurred.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk shall **REMOVE** Document 31 from the Court's pending motions list. The Clerk shall enter final judgment in favor of Defendants and **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**